Plaintiff sustained serious physical injury when the Tudor Pontiac Sedan he was driving, in broad daylight, collided with a truck of the Southern Advance Bag Paper Company, Inc., driven by a colored man named Glen Padgett. The accident occurred on an asphalt (black top) surfaced highway ten miles west of the Town of Jonesboro, Louisiana, and approximately 100 feet east of a hill or rise in the highway. Plaintiff was driving easterly. The truck was going westerly. It was preceded, less than 100 feet, by another truck of said company, at the time being operated by a colored man named Alton Potts.
Plaintiff sued to recover damages resulting from the accident and impleaded the two negro drivers and their employer, the Southern Advance Baz Paper Company, Inc., as defendants. He alleges and now contends that he was driving at a speed not in excess of 40 miles per hour and as he reached the apex of the hill or rise in the highway he was suddenly confronted with said two trucks, side by side, going at a fast and reckless rate of speed of not less than 50 miles per hour, apparently racing or as if one truck was endeavoring to pass the other, and that one trying to prevent the passing, while ascending said hill; that on realizing this situation he applied the brakes, reduced the car's momentum, drove it to the right and on to the shoulder of the road when at a distance of from 100 feet to 150 feet east of the top of the hill above mentioned; that when and after he had pulled his car as far on to the road's shoulder as was safe and possible, the truck driven by said Padgett, then on the left or south side of the highway, ran into and struck his car about the center of the left-hand door, knocking the opposite door open, through which he and the front seat cushion, by the force of the impact, were catapulted into the ditch.
The specific acts of negligence charged to the drivers, allegedly causing the accident and resultant injuries, are set forth as follows, to-wit:
Excessive and reckless rate of speed; failing to maintain a proper lookout for traffic on the highway; failing to do any act or make any move to prevent an accident, but on the contrary, driving heedlessly and recklessly forward after discovering plaintiff's car approaching them, until it was too late to do anything to avert the impending collision.
The defendants filed joint answer. The company admits that Padgett and Potts at the time of the accident were its agents and employees and were then acting within the scope of their respective duties. The happening of the accident is admitted but all defendants deny that it occurred through or because of any negligence or carelessness on the part of either driver. In the alternative, the contributory negligence of plaintiff is pleaded in bar of recovery by him and as a basis for this special defense it is alleged that:
Plaintiff for some reason unknown to defendants, at or about the time he reached the apex of the rise in the highway, suddenly applied his brakes or in some manner caused his car to skid and turn at right angles across the highway to the north side thereof and to violently strike the truck driven by Glen Padgett, who, at the time, was on his side of the highway and traveling at a reasonable rate of speed.
Plaintiff's demand was rejected and his suit dismissed at his cost. He appealed.
At the time the accident happened the surface of the highway was slippery from a drizzling rain then falling.
The left front portion of the truck collided with the left-hand door of the sedan about the driver's seat. The impact was undoubtedly violent as all of the left side of the body of the car from the cowl to the rear fender was torn away. The left side of the car's top was crumpled near the center and bulged upward. Plaintiff and the cushion on which he was sitting were burled violently against and through the right door into the ditch on that side of the road. He was rendered unconscious. Strange as it may seem, the impact did not overturn the car. It rested Oil its proper side of the highway with both right wheels upon the shoulder and both left wheels upon the asphalt. The truck rested on its side of the road angling slightly toward the south with left front wheel close to the medial black line. The vehicles were far enough apart for traffic to pass between them.
[1] It is the defendants' contention that plaintiff, hurrying to fill an engagement *Page 751 
with a girl friend several miles away, and engrossed in pleasant thoughts, was driving too rapidly on the center or near the center of the highway, slippery at the time from rainfall, and upon discovering the trucks approaching him, suddenly applied his brakes in the effort to get on his side of the road; that this action caused the car to skid and control thereof to be lost; that the car skidded sidewise across the black line, struck the Padgett truck violently and rebounded to the other side of the highway, where it rested.
The asphaltic portion of the highway at locus of accident is 17 feet wide. Each shoulder measures about four feet.
Plaintiff's version of the accident is that be could not see over the hill in the road and as he reached the top of it he then first discovered the two trucks coming toward him, 125 feet away, which, he says, "weren't exactly side by side, but the one behind was almost up with him (the front truck). He looked like he was passing or racing. I couldn't tell if they were racing or passing." He is sure the rear truck was on his (plaintiff's) side of the road, and is equally certain he was at all times, prior to and at the time of the collision, on his own proper side of it. He further testified that: "I tried to get off the highway. I put my brakes on and turned to the right," and he adds that his car was struck as the front wheels were leaving the asphalt; that he never lost control of it. He stated that he had borrowed the car from his sister to make the trip to Ruston to see a girl friend.
Plaintiff introduced as a witness in his behalf one Dick Parker, who testified that he saw the collision at a distance of approximately 200 yards away. His testimony is contradictory in some material respects and so equivocal that we have to not consider it. Plaintiff's counsel pleaded surprise at some of his answers and was allowed by the court to interrogate him as if under cross-examination.
The other eyewitnesses to the accident, besides Padgett, were two colored helpers riding with him. Alton Potts, driver of the forward truck, and his helpers did not see the relative position of the car and truck when the collision occurred but did see plaintiff's car as it came from, over the hill and passed them.
Glen Padgett testified that the trucks had each delivered a load of pulp wood on the railroad about one-eighth of a mile from the scene of the accident, and were on their way to get another load; that they were traveling at about 35 miles per hour, his vehicle trailing the other by about 75 feet. He described the accident in the following language, to-wit: "* * * It was drizzling a little rain. We was going on down the road and the car broke over the hill. Just as it broke over the hill, it looked like he put on his brakes and he came sliding down the road cross ways of the road. I hit my brakes. My truck skidded and the car hit in the side and the car bounced back from the truck. * * *"
He further testified that plaintiff "was holding about the middle of the road" when he came over the hill. He is positive he was on his own side of the road and applied the brakes after seeing the car skidding toward him and that his left front wheel was near the black line when the collision occurred. He denies that he was trying to pass the other truck or that they were racing. The two helpers riding with Padgett corroborate his testimony in all material respects.
Alton Potts testified that he was driving his truck at 35 miles per hour; that he met plaintiff as he was coming over the hill; that he (plaintiff) applied his brakes and his car began to skid. He further testified:
"Q. You met the soldier about the top of the hill? A. Yes, sir.
"Q. It was there when he met you that he applied his brakes? A. Yes, sir, I thought he was going to hit me.
"Q. What part of the car skidded toward you? A. The back end. It skidded in front of me; the front end was kind of angling. I cut over out of the road.
"Q. The from end of his car was on which side of the road? A. His right.
"Q. When you first saw him, it was on his right hand side of the road? A. It looked like one wheel was over the black line.
"Q. He stepped on his brakes? A. Yes, sir, and it skidded.
"Q. You pulled your truck to the right and passed him? A. Yes, sir, I cut over out of the road."
One of the boys who was riding with Potts also testified. His testimony substantially is the same as that of Potts. *Page 752 
These negro men were not in the company's employ when the case was tried eighteen months after the accident.
Two men who visited the scene of the accident the day it occurred and two who visited it the following day, testified that the skid marks of the car from near the crest of the hill to where it rested, a distance estimated at from, 75 feet to 85 feet, were well defined and were entirely on the south side of the center line of the road. Some of these witnesses testified that they recognized signs on the asphalt and shoulder indicating that the car had been knocked southerly. One of them said, after being struck, it "skidded sideways and plowed the dirt toward the ditch."
The testimony and physical evidence in this case tender for solution a very difficult factual question. It is certain that when the trucks were first observed by plaintiff, evidently a moment prior to his reaching the crest of the rise in the road, a situation existed that prompted him to apply the brakes and veer his car to the right. He was either too far over on his left side and sought to regain the right side or else the Padgett truck blocked his way by being wholly or partially over the medial line.
Defendants' counsel in brief states that the trial judge reached the conclusion and stated in oral reasons for judgment that the truck at no time was off of its proper side of the highway.
If the testimony of the colored witnesses should be taken at face value, we would have to conclude that plaintiff was wholly responsible for the accident. Against their testimony is arrayed that of plaintiff and the four men who saw and traced the tracks of the car from the crest of the hill to where it rested. These men, so far as the record discloses, are entirely worthy of belief. One of them is a traffic officer and has held that position for thirteen years. Only one, a brother-in-law to plaintiff, could be accused of having any interest in the outcome of the suit. Since his testimony regarding the tracks is not different from that of the other three men, it is, of course, of the same probative weight as theirs. All of these four witnesses are most positive in their testimony and if what they say is accepted as true, certainly the car held to its side of the road, from the hill until collided with. And it would follow that the negro witnesses were either mistaken in giving their testimony or swore falsely.
All things considered, we conclude that plaintiff's version of the accident and attending facts is the correct one. The Padgett truck must have been astride the medial line when plaintiff first saw him. Whether Padgett was endeavoring to pass the truck or was merely driving along the center of the road at the time is unimportant. In either instance he was violating a rule of the traffic law forbidding such to be done under the prevailing circumstances.
Defendants confidently rely upon the fact that the truck after the accident rested on its side of the highway. They argue that if plaintiff's theory of the accident be correct the truck, the heavier of the two vehicles, crossed the medial line, rammed the car and bounced back to its proper place on the highway. There is practically no testimony bearing upon the movements of the truck immediately after the collision. One witness says the motor stopped but none of them undertake to describe the truck's movement immediately following the impact.
The movements of colliding vehicles going at a rapid rate of speed is ofttimes difficult if not impossible to explain. Their antics are sometimes really mystifying. Things happen so quickly that the occupants, in many cases, do not really know what has happened save that a collision has taken place. We are unable to explain how the truck got back on its side of the road after the collision. One reason for this is that we do not know exactly its position on the highway when the collision occurred. The fact remains that the car was struck when on its proper side of the highway, and that it maintained that side uniformly until it was struck.
[2] Plaintiff was promptly taken to a clinic in Hodge, Louisiana, not many miles from the place of the accident. Being a service man, he was, after five days in this clinic, carried to the Station Hospital at Barksdale Field near the City of Shreveport. This was on November 10, 1941. There he was examined, X-rayed often and received free treatment by government physicians. When admitted the patient complained of pain in the chest and hips, and shortness of breath. First X-ray pictures disclosed fifteen per cent pneumothorax (air or gas within the pleural cavity) of left lung, extending from the seventh rib to the base; a collection of fluid in the chest and an incomplete fracture involving the anterior portion of the *Page 753 
second rib. Plaintiff continued to complain of pain in the neck and right shoulder which grew worse and it was decided on December 8th to determine the reason for the discomfort. Another X-ray picture was made. It disclosed: "* * * some narrowing of the intervertebral space between the 4th and 5th cervical vertebrae. * * * no fractures visualized. * * * a rupture of the intervertebral disc between the fourth and fifth cervical vertebrae."
Plaintiff continued to suffer from pain in the chest and pelvic region and with minor discomfort from a wound above the left eye. Mainly the treatment administered to the patient was bed rest. A plaster-of-paris splint was applied to his neck on December 17th. This was removed permanently on January 16th, at which time the patient could move his neck without pain.
In the treatment of Plaintiff X-ray pictures were made frequently to determine the progress of the lung involvement. He was discharged on January 25th. At that time the doctor under whose special care he had been all the while, testified: "* * * I found him to be fully recovered. No condition existed which constituted any impairment to this man's ability to perform his duties as a soldier, or to do and perform other work and labor."
After being discharged from the hospital, plaintiff remained at Barksdale Field for thirty days and then returned to military duty in California. He was there placed in a Casualty organization because, as said by him, he could not perform regular military duties. He reported to a doctor weekly and remained in camp there until December 20, 1942; he was then transferred, at his request, to Camp Claiborne, Louisiana, where he was stationed at the date of trial, April 6, 1943.
Appellant complains that the vision of his eyes as a result of the accident was impaired, but no such injury was found by the doctors at Barksdale Field; and so fat as the record shows, he made no complaint while there concerning his eyes. He did not testify that he had consulted an eye doctor concerning the asserted impairment of vision. He says that free movement of his neck is modified; that it aches and gets stiff and pains some when the weather changes.
When plaintiff was injured he was a Private First Class, but was promoted to Corporal on February 11, 1943. In April following he was promoted to "Technician Fourth Grade Sergeant", which rank he held at time of the trial. While he was rated "casual" he was not in line for promotion.
Undoubtedly, plaintiff was badly bruised and shocked from the accident. The soreness therefrom continued for some time. He received contusions about the face and some shallow cuts from shattered glass. There is, however, no permanent disfigurement. He seeks no award on this account.
We are not convinced that any permanent ill effects from the accident will be plaintiff's lot. The military promotions go far toward proving him to be in good physical condition. He is in combat service. Of course, we would expect him, now and then, to feel some temporary discomfort and inconvenience but these will cease. In our opinion an award of $2,000 will adequately compensate plaintiff for the pain, suffering, shock, discomfort, etc., he has experienced from the accident.
There is no serious contention that Alton Potts in any manner or way contributed to the accident; no act of his made it possible.
For the reasons herein assigned, the judgment appealed from in so far as it rejects the demand against Alton Potts is affirmed, but said judgment in all other respects is annulled, avoided and reversed. And for said reasons, it is ordered, adjudged and decreed that plaintiff, Ray T. Clemens, do now have and recover judgment against Glen Padgett and the Southern Advance Rag Paper Company, Inc., defendants, in solido, for the sum of $2,000, with five per cent per annum interest thereon from judicial demand herein until paid, and for all costs. *Page 754